and the third case is number 2007-3213, Hawkins v. Department of Homeland Security. Again, those cases are being submitted on the briefs without oral argument. The one case in which you will hear oral argument this morning is number 2007-3119, Parrott v. American Systems Protection Group. Mr. Schiller, did I pronounce your client's name correctly? Yes, Your Honor. Okay. You can step up and I just want to confirm you've reserved five minutes for rebuttal? That's correct. And you understand how the lighting system works? I do. Okay. You can start whenever you're ready. May it please the Court, David Schiller on behalf of Petitioner Jeffrey Parrott. On May 27, 2005, Mr. Parrott was faced with making a life-altering decision. He was given four hours to make this decision. He was not informed in any specific way as to what the charges were against him that would potentially end his employment. It was highly suggested by the people who met with him, Mr. Compain and the others, that he ought to resign. He had no counsel. TSA, on the other hand, brought their own counsel and went so far as – and that counsel went so far as even giving him legal advice, which was clearly improper. What legal advice was given? Well, she advised that she – Ms. Conant says, well, I told him about the MSPB process. She was clearly overreaching as an attorney representing the U.S. government to tell him about what his legal rights were. No, I mean, doesn't – I mean, as a practical matter, if someone is removed, the agency is required to give removal notice advising their rights, giving them where they can appeal to over a time period and so forth. So, I mean, I kind of see that as within that context. Well, Your Honor, he – I mean, they are putting him in a room. They're giving him four hours and suggesting to him, you really ought to resign because if you don't resign, we're going through a determination process. And even Mr. Compain says, you know, if I show you the charges, the best alternative you have is then to resign. He says that in the record, page 301, and the dissent notes that. And that's not really correct. And it also presupposes he would have lost and that it was a lost cause to fight out his case. And in a certain respect, it reveals what Mr. Carrick was saying all along in that basically you need to resign. Well, let me see if I understand what the options were here. I mean, I suppose the agency could have walked in that morning and handed him a piece of paper. Here's your proposed notice of removal, in which case he would have had two options, right? Either fight it or resign after having been presented with a proposed notice of removal or some point before the removal if in fact he went through. He could have done it. In fact, they gave him a third option, it seems to me, and I don't want you to explain to me why this isn't so. And their third option was, at least as they viewed it, more attractive potentially to him than either of the other two options that they could have presented to him on that Friday morning, which is if you resign before we hand you the piece of paper, then a different notification goes into your permanent record. Now, it seems to me that that is different from coercing him to resign. It's giving him an option which is more attractive than resignation after something they could have done, which is just present him with a notice. Why not? That's one way to look at it, potentially it was more attractive, potentially. But it had the other effect of not informing him exactly, A, B, C, what the charges were. Well, the administrative judge said that he was informed orally the general nature of the charges. I mean, I think on page five of the administrative judge's opinion, the administrative judge runs down what at least the administrative judge found. But those are the findings that we have. And in some detail, if you compare those findings with the actual proposed removal notices, it seems like it's a fair summary. Well, there are two ways of looking at it. And one is the one that Your Honor presented, that this is more attractive. But it had, like I say, it had the effect of clouding what the charges were. And this is- Is your objection really that he should have been given a more detailed account of the charges, and that's the problem? I think there are a number of problems. One, the critical problem is he was only given four hours, and that's really viewing the situation at best. Well, let me add to that. I want to go back to the four hours. The four hours is, it seems to me, the most troubling aspect of this case. But in thinking about it, I wonder if this is different by virtue of this better option that was offered to him. If this is different from the following hypothetical, which I'd like you to address. Suppose that on Friday morning they walked in and said, look, we have a notice of proposed removal, which we're prepared to give you. But we want to avoid trouble. You want to avoid trouble. And in order to avoid trouble, what we're going to do is we're going to offer you an effective early out, which will be you can resign, and we will give you $25,000 bonus upon your resignation. But you have to, if you want that deal, you have to take it today. Would that render, and he chose it. He said, I'm not going to walk away from that. I'll take it. Would that render his resignation involuntary? I wouldn't go so far as to say it would be involuntary. I'd certainly say it's involuntary. It still could be. I would say, though, that the difference here is. Even though they're offering something that they didn't have any obligation to offer, it's very attractive to them. Is it involuntary because it's too attractive? And no one would turn it down? I think he might still turn the $25,000 down. He might. And they say, well, how about 50? He says, OK, 50, I'll take it. Does that become involuntary? At some point, there's going to be enough consideration. But that's clearly different from what we have here. All he was given monetarily was basically his earned leave. Well, I understand that. But what I'm trying to get at is whether the timing problem is a problem where what they're offering him is something that's a benefit, which he can turn down. And if he turns it down, he's no worse off than he is when he's given the two choices that they could have given him at the beginning of the day. I think it's a little difficult to separate them out. OK, in your example, they would give him a benefit. However, the time constraint, he still doesn't get to effectively evaluate the benefit. And what's struggling is he says, I'd like to consult with counsel. He's been given four hours. A lot of that is discussion with campaigning. A lot of it is discussion with the retirement system. With respect to the benefit, I mean, it was a pretty easy benefit to understand. The advantage was that there would be no indication of any sort of a potential adverse action or an adverse action being taken in his personnel file. And we know from our experience in these cases that that's a very positive thing. Because an employee leaves with no blemish in his or her file. That would be a benefit. However, there are two problems. One, he can certainly be asked if he tries to reemploy. Well, tell us about your last five years of employment. I think even the majority opinion in the board pointed out that that's standard procedure. Well, what were the circumstances surrounding your termination? So you're not really gaining anything. And there's another point I wanted to make on that. Let me conclude at that point then. You know, the other problem with what they had is they gave him the four hours. I know what it was. Here's what makes no sense about his resignation. The two items that they had against him was the security guard and the fact that there was a schism between him and the supervisor. Well, he knew that. He reported it. That's what makes no sense that he knew it and he reported it, and yet he was so afraid to fight it. That is what makes no sense about his resignation. That if he knew those things, that he reported and was so confident that he reported and thought it was wrong, and I'm being a whistleblower, that it was flipped around on him. That if he knew that, there's no way he would have resigned. That is what— I understand. You're saying he had a full understanding, basically, of what formed, in his view, erroneously, the basis for the removal action? No. What I'm saying is if it was clearly told to him that security breach and the schism between you and your supervisor are the only reasons we have for your discharge, he would not have resigned. It makes no sense, and that's why the benefit that's being proposed here was—you can say it's a benefit. It was really an obfuscation of what the charges were. That is really what happened, and that is why he made an uninformed decision. The time pressure was placed on him. Totally arbitrary. Even the administrative logic I've said. Supposing—let me ask you. Supposing they had—the agency had acceded to a request for more time until, you know, Tuesday, because Monday was the Memorial Day holiday. Would that have solved the problem, in your view? It would have come closer. In this case, he would have made a different decision. So, to pick up on your colloquy with Judge Bryce, the real problem, in your view here, is what you see as overly short time views. The overly short time views, with no justification for it, and when you have the witnesses giving three explanations for the justification for it, and you have ALJ saying, there's no doubt in my mind it was used to put pressure on him. That is the paradigm of coercion. Short of making up something or giving a physical threat, there's hardly any more pressure that they could have applied to get it to resolve. And I realize that that was my thought at the time. Well, we'll give you your full—you've gone over by about a minute, but we'll give you your full five months of thought. And we'll hear from the, I guess, the Merit Systems Protection Board and the agency. Mr. Gaugher? Yes. You want to make sure I have it correct? That's correct. Gaugher, yes. Gaugher, okay. Just to confirm, you've split your time with Mr. Lester from the Justice Department. You have 12 minutes, and he's going to take three, is that correct? That's correct. Okay. And may it please the Court, the administrative judge in this case was troubled by the time constraints, and it's clear from his initial decision he gave that issue serious consideration. The board was troubled, too. Right. The AHA had to split board. That's correct. The administrative judge gave that issue serious consideration, but he weighed the totality of the circumstances, and he considered all of the circumstances in this case. Mr. Gaugher, let me ask you this. Clearly, the time fuse is the critical issue here. That's apparent from the briefs. It's apparent from the colloquy between the Court and Mr. Schiller. And I'm wondering, really, why is the board the main, say, respondent or a colleague? I mean, you know, the board is really in a position to kind of be able to talk much about why more time wasn't given. I mean, the board's the adjudicator here. The government, as represented here by Mr. Lester, is really the person who is the most. Why is the board properly the respondent here, as opposed to the government, the agency? Well, under the statute, the board is the proper respondent in cases that involve the board's procedures, and as in this case, the board's jurisdiction. Is there a specific statutory provision that so dictates? I had thought that that had been a matter that we sort of worked out on a case-by-case basis. Is there a provision that expressly says the board should be the respondent in the cases involving the jurisdiction and procedures? Yes, I'm trying to remember to say it's 7703. I'm sorry, what is it? 5 U.S.C. 7703, and I can't remember the rest of it, the exact paragraph. But basically, it's two parts. One paragraph says the board shall be the respondent, and then the second part says unless it goes to the merits of the case. And here, the board never reached the merits, whether the charges against Mr. Perry were- This is a subject of our CA. Right. To say that this doesn't go to the merits is a little bit of a fiction. We're talking all about the merits. It's just a question of whether the merits create this odd animal known as an involuntary resignation, which then is for the board's jurisdiction, but isn't if the merits are ultimately determined to be that it was voluntary. It's an odd document to say this. That doesn't go to the merits. It seems to be a blended reality. Well, in Garcia, this court found that the merits have to be proven by preponderance of the evidence, and that's the issue here, whether or not the petitioner proved that the board has jurisdiction by preponderance of the evidence. So in that type of case, the MSPB is the proper respondent. It goes to the authority of the MSPB, the scope of the board's jurisdiction. I guess, Mr. Gover, there are some cases, and I can't come to think of them right away, where the merits and the jurisdictional issue would be conflated. This is, I suppose, not one of them, because assume for the moment that Mr. Parrott were able to prevail on his contention that his resignation was involuntary, he would not get his job back. He would have the opportunity to challenge the approval action for the board. There may be some cases, I suppose, and I just can't think of them offhand, where if the litigant won on the jurisdictional issue, perhaps he or she would, if so facto or automatically, prevail on the merits. I don't know. I think your recollection is correct, by the way, on the statute. 7703A2 does seem to provide pretty much, as you described it, one could quibble with whether the order in this case deals with the merits of the underlying personnel action. But given that the board treats these as jurisdictional questions, as opposed to going to the merits, I guess that's at least reasonable construction. And you're correct. I mean, there is orders on a case-by-case basis, which consider the statute and the court of case law on who should be the respondent. So there is a history to that. Well, this first started to trouble me again a while back when we had an attorney request in a case in which the board was the respondent. And it was very often we asked the government whether the agency was liable for the fees. You probably remember the case. It's Coakley. And the board said, we're not liable for the fees. We just decide cases. The government says, we're not liable for the fees. We're not a party. That was very often. Now, I see, however, the statute provides in the case for attorney fees that the board should be the respondent. So maybe the right thing to do in that case would be for the board to hand the case off to the government. In this case, the agency. Well, I believe that that refers to an attorney fees decision issued by the board. Yeah, but I'm not sure why it shouldn't also apply to an attorney fee decision on appeal. That's not the merits of this case. Well, the issue of time constraints here, what the administrative judge found basically is that this didn't come out of the blue. That for months, there had been investigations, two investigations, in fact, here. And especially in the second one, Mr. Parrott was involved in that investigation. He actually wrote a statement that's very close to what ended up being the notice of removal, explaining the problems at the airport. He was also, he knew that this professional review board, this internal board at TSA, was considering imposing an adverse action upon him. And he knew also from that email how he could challenge that. That there would be a two-step process, starting with the board, the PRB, and then that he would have a chance to challenge that. Did the agency know that he had a lawyer? Didn't he make them aware of the fact that he had a lawyer and he wanted to try and get a hold of them during this process? I don't know that, well, I don't know that he told that he already had a lawyer. And that's a fact that's not in the record, whether he had a lawyer before May 27th, helping him with his employment issues or not, I don't know. He did, he was given, as the administrative judge found, ample time to call anyone he wished. And he did call an attorney. His attorney was absent, was not available. Was the agency aware of the fact that he was attempting to call his attorney? I don't know when the agency became aware. The record shows that he was actually left alone so that he could make phone calls and work out other questions. So there's no evidence in the record that would suggest that the agency was aware that he was attempting to call his attorney? There's, you know, not that I can recollect that they knew at the time. Maybe I'll have a chance to ask the agency. Okay, whether or not he knew at the time, whether the agency knew at the time that he was attempting to call his attorney. You know, I think there is testimony. Well, before hours, now that I, to answer your first question, there is, I think they did know that same day, based on the testimony of TSA witnesses, that he had attempted to call his attorney because after the fact, after that hour, he was alone. That was when he requested more time. So he said to the agency, I need more time, I'm attempting to call, get in touch with my attorney, I'm unable to. Why put him on the spot and make a decision at that moment? What is the justification for the immediacy? Well, the immediacy only applied to the offer on the table that the agency was only going to keep on the table until it closed the business on that day. Why? Because the benefit for that offer, there's benefits on both sides of, for misrepaired design, for personal reasons. The benefit for the agency was to wrap things up by closing the business that day and not have to go through this removal process. Okay, well, so if he says no and walks away because he can't get in touch with his attorney by the end of the day, then the agency is going to have to go through the removal process or do it until Tuesday. It still seems it would be to the agency's advantage to do it until Tuesday and not sort of possibly force him to make a decision in the absence of counsel that the agency knew he had. Well, it may have been to the agency's advantage to extend the offer, but the agency chose not to. I'm not aware of any legal obligation that the agency was under that would prevent it from withdrawing its offer at the end of the day, and that's what happened here. I mean, certainly after this notice of proposal removal was served, there could still be negotiations, and an attorney could be involved. But the agency was only willing to extend this offer until the close of business on May 27th, and that was the cause of the time pressures that issue here. Now, despite the fact that there wasn't an attorney present with the petitioner, the administrative judge considered the fact that Mr. Parrott was a professional. He had over 20 years of service in agencies like the CIA, the FAA. He had been in highly stressful positions. He served as a police officer. And the administrative judge also considered testimony by the witnesses that Mr. Parrott conducted himself calmly and rationally and asked questions throughout the day. And so those were circumstances that were considered. So a person who operates frequently in high-stress situations, you're suggesting that he would not have been stressed out by the pressure that was put upon him. It's been clear that you're taking away from that. Why isn't it just the fact that a person who's in high-stress positions would be able to not show the stress that he's feeling because he's accustomed to being it? Not that it doesn't exist, but to be simply capable of continuing on in the discussion despite the fact that he feels enormous amount of pressure. Well, I don't mean to say that Mr. Parrott didn't feel any pressure. Certainly there was pressure. So then what is the basis of the finding of the agency then, the AJA? I mean, what import does it have to our decision on whether he was coerced that he happened to formerly be a police officer and had worked for the agency for 20 years? Why is that significant to the agency's determination? Well, it's significant because part of the question here is was he able to enter into a settlement agreement and to submit his resignation? Was he able to make these decisions without the assistance of counsel? And the administrative judge found that, indeed, he was, that, in fact, he was able to negotiate. He was able to secure benefits through the negotiations, such as he was able to extend his resignation months later so that he could stay on the rolls, keep his health benefits, keep his life insurance benefits, and be on the rolls while seeking a new job. And so these are all the circumstances that are part of the totality of the circumstances that were relevant in the judge's determination here. Finally, I see my time is up. Yes, you are. I think you've used up both your time and the full 15 minutes for the respondent and colleague. We'll give Mr. Lester his time. And, Mr. Schiller, you'll have time to respond. So we'll hear from the agency now. Mr. Lester. Thank you, Mr. Court. I don't have much to add. I guess the question that you can sense from the colloquy between Judge Moore and Mr. Garber, you know, why the big rush here? I mean, why? I mean, we wouldn't even be here today. I think there's a good chance we might not even be here today. Surely you brought yourself some trouble. Why not just give them until, you know, the end of the weekend, come in on Monday, and then you have the whole weekend to think about it? Just why the rush? Well, Your Honor, the record is not completely clear as to why the agency was insistent on keeping this extra option to Mr. Parr open only that day. But the administrative judge did apply the applicable law. He correctly identified this court's precedence with regard to the fact that time limitations can, in fact, render decisions like this involuntary. But that this court has applied a totality of the circumstances, and that time limitation issue is a factor in that. But he applied that factor, looked at what he viewed as a totality of circumstances, the fact that Mr. Parr was aware, or he found Mr. Parr was aware before this day that there was likely going to be some kind of adverse action against him, that he had known that for several months, that he had had time to think about, should have had time to have thought about it. Looking at the totality of circumstances that the administrative judge found on pages 19 and 20 of the appendix, he found that based on that totality, based on his view of the credibility of witnesses, the testimony that he received, his view of Mr. Parr, and what he was understanding at that time, that, in fact, the decision was not involuntary. And so, based on that, he found that the board lacked jurisdiction. Now, obviously, this is not a perfect case, but the A.J. did make credibility findings. Not perfect. It would be better if there was more time. Sure. Sure there would be. But the A.J. made findings, and he applied replicable law, and certainly those findings are based on substantial evidence, based on the administrative judge's credibility findings. In response to one of the judge's questions with regard to whether someone who's sophisticated might be able to, might feel stressed yet not show it, that certainly is possible. It's just in this particular case, the administrative judge found that based on his view of the witnesses, that that was not the case, and that the A.J. found based on that totality, as defined by this court's precedents, that it was not involuntary. You know, the problem with the totality of the circumstances is, of course, and there's a thousand different areas, is that it tends to smush together a lot of factors and not tell you very much about the importance of each one or why each one is important. And in going back and looking at the various time pressure cases, for lack of a better term, I was having a hard time figuring out what exact role the time pressure has, why it's pertinent. We often recite it as one of the factors. I can certainly understand duress. If you say, you know, you must resign or will do something horrible that we either don't have a right to do or would be at the outer edges of what we have a right to do or whatever, that would be an instance of, like, coercive duress or whatever. I can understand, certainly, the misleading cases where you say, oh, well, we have the following evidence against you when, in fact, we don't. And that all sounds like it renders the decision involuntary. The timeliness, the timing factor is a little more sub. What do you understand to be the underlying principle that renders the decision involuntary if made in a short period of time as opposed to a long period of time? Before I answer your question, most of my time is up. No, you can respond. Okay, thank you. Go ahead. We'll even out the time. That's a long question. Thank you, Your Honor. Well, I think that I don't know if this is going to be concise enough or direct enough to tell me it's not. If you had an individual who was presented with, you're going to be fired right now or resigned. That, I think, is more on the line. That's a concrete choice. You're going to have something bad on your record. You're out. You have no time to take any kind of action. But I guess the question is why does that coerce one choice over the other? Well, it coerces the decision. It's just not clear to me why that is pushing towards the resignation. Well, I think, in my mind, it just plays into the whole telltale circumstances issue. If you have two minutes to make a life-changing decision, that's the one you have a little more time to think about. But the less final the decision is, or the option you've been presented with, in terms of, like I said, if there's an immediate removal or if you resign right now, you won't have to say you've been fired. Here we have not a notice of removal. They were going to provide him with a notice of proposed removal, after which he still would have had time to think of various, not exactly the same kind of immediate and final, this is going to be the end of the road for you, type of option. Just based on, again, I have to get back to the telltale circumstances, but my understanding of discourse precedence is that's simply another factor that you've thrown in there in terms of determining whether or not, from an objective standpoint, the employee was coerced. What case do you understand as saying that amount of time is a level of consideration in the coercion? I think Garcia cites to several cases that talk about different standards that apply in terms of, if I recall correctly, the Middleton case talks about time limits, the Schatz case, it mentions time limits as being something that can be considered. But, again, my understanding is this, under this course of precedence, it all becomes a part of the telltale circumstances that the HA looks at. And here the HA did look at that. He applied the right law and came up with factual findings that are based on substantial evidence. From what you said earlier, I take it that you would take the position that if, in fact, some extra benefit were offered to the employee that, above and beyond what the agency was required to offer by way of choices, I mean, hypothetically, I suppose they do offer a $50,000 buyout, that you would say, if I understand your position, that even if that's offered on a, taken in the next ten minutes or it's off the table, that would have no effect on the voluntariness question that we're ultimately asked to resolve. We're looking at, and I think you would still probably look at that as part of the totality of the circumstances. The fact that you're being offered something that the agency doesn't have to deal with. Well, I'm perplexed that you would say that. Well, I mean, certainly we have that in this case, where Mr. Kerry got an extra $4 million. The question is, does this time matter? In other words, suppose, let me change the subject. Suppose that they really are, I mean, this is something which, I suppose all you're going to say is, suppose we decide to go into the Dutch auction, and they say, you know what, here it is Friday, the Friday before Memorial Day, and we're going to start off with $50,000 as the option, and every 30 minutes that goes by, the amount drops by $10,000. At the end of that period, at the end of two and a half hours, we're going to hand you the notice and then no money at all. Would that render his decision to take the $50,000 right on the spot involuntary? I would say no. I would say no because, particularly when the agency, as here, is offering something, giving an option that it didn't have any obligation to give in the first place. It could have followed simply that you shouldn't notice a proposed removal. Even if no one in their right mind would turn down, we suppose instead of $50,000, they said half a billion dollars. No one would turn that down. You could say it's involuntary, and then 0.0 percentage of the world's population would turn it down, but when you say we're still not voluntarists, in the sense that we're talking about. I think it would be pretty hard, well, I think it would be pretty hard to say that it's not voluntary to accept something like that. It's an option the agency didn't have to offer, something that obviously gives a big benefit that the employee couldn't get just going through the regular channels. Certainly, that would seem to be a voluntary acceptance of. There wouldn't seem to be a term that the agency is coercing the employee to take. Certainly, it's negotiating. Thank you, Mr. Lester. This may be beyond the scope, Your Honor, but the court did ask questions about whether the MSPB or the government or the agency should be the proper respondent. I can say that we have been taking, I agree with Mr. Goddard's interpretation of the statute, and we've interpreted it the same way. We have been, in cases like this, trying to intervene in those cases as a matter of policy. Would you agree that in these involuntary cases where the merits and jurisdiction really get intertwined, nonetheless, the fact that it's not only jurisdiction, nonetheless, makes the MSPB the proper respondent as opposed to the agency? Well, I don't want to speak too much on it because I'm not as up to date on this issue as I should be. I remember the old school days where we lived. That's how we interpreted things, and I know there have been a couple decisions since then that have impacted that somewhat. I'm not aware of any discussion with regard to this particular case that the MSPB should not be the respondent. Thank you, Mr. Lester, for that additional enlightenment. All right, we'll hear from Mr. Schiller now. Mr. Williams, let me, before I put any time on the clock, let me figure this out. Mr. Schiller is entitled to his five minutes plus. Mr. Lester had three minutes plus an additional three minutes, and he used that plus in response to a question an additional seven minutes. So why don't we give you, Mr. Schiller, your five minutes plus an additional ten minutes. So you'll have 15 minutes. Okay, thank you. I want to make sure that maybe that's a little bit generous, but strictly speaking, in terms of the way the clock ran, you'll have really 15 full minutes. I think that should make a time equal between those seven minutes all in all. So, go ahead. Thank you. Well, I wanted to talk about the time issue, why that's important, and the totality of the circumstances. Of course, it's important to look at the totality of the circumstances, because if we have too rigid a test, we may be overlooking some important things here. But there's no case, as far as I'm aware, where somebody asked for legal counsel, more time to seek legal counsel. Here, that's not under any test, but I certainly think it's very important. And now the question about why is time so important? The reason time is important is for two reasons. One, under time constraints, a person is not going to make as intelligent a decision. I mean, we all know that. If you're put on the spot, something comes out of the blue. If you ask me, the holding of Arizona v. Hicks, off the spot, am I going to know it? No. If you look it up, think about it, I could tell you. The other thing, more importantly, is it pushes the person in the situation they're in to make the safe choice. That is the general inertia. You're a career veteran employee, almost 20 years. You're getting very close to a milestone that affects your retirement. Let me ask you a question on this time issue because of what happened in the time period. I mean, there is evidence before us that Mr. Parr sought to talk to his attorney. He was not able to turn to us. Soon after the moment that, you know, after the first ten minutes, he'd been able to reach his attorney, and they had had a discussion, and Mr. Parr had then gone ahead and made the decision that he did make. Would that have changed the case? Would you still be here? It would have made it a much more difficult case. I don't know that it would have been involuntary. Clearly, we would have no argument that it was an informed decision, except for the fact that there was some obfuscation as to what the charges were against us. I think the real critical thing is- So it's not a matter of pure timing. It's a matter of what you had done at the time. Well, I think it is. Here, you can't totally separate it. The fact it was the Friday before Memorial Day weekend, it was very difficult to get anybody on the phone. You know, how was he going to get legal advice over the phone on a Friday about an issue that, you know, in Raleigh, North Carolina, how many people know about this? How many attorneys practice it there? There are very few. I mean, it's just very difficult to get this. Does that mean that every employee is faced with an unpleasant set of options? It's sort of like, you know, the criminal context. The minute they express a desire for an attorney, everything's got to stop until they can get a hold of one. What is the rule of law you would like us to make? In these circumstances, he really should have had an attorney. I mean, clearly, there's no U.S. Miranda site that can make you. But if you're talking about coercion, here where somebody had fewer than four hours to make a decision, he had to wade his legal options through an unknown territory and getting back to the- The agency didn't have to offer it. The agency came and offered him a benefit. He could have declined the benefit and fought the charges. I would submit, respectfully, that the benefits that the agency gave him were totally de menos. De menos? Really, if he had in his file a notice of proposed removal, I mean, isn't that a really significant impediment to future employment? That would be. However, he still has, in the board's majority opinion, they point out, he would be asked, it's operating procedure, what was the circumstances regarding your resignation? In real terms, it wasn't as helpful as they'd like to make it. Not having this in your record. He still has to, well, why'd you resign? What happened? You resigned and now you, I mean, the reality of the situation is you're going to be out of work for a while. You just simply resigned. Something must have happened. But wait, couldn't he also look for jobs during the time that he's continued to be employed? He also stretched out the time of his employment quite significantly. At least we could recoup all of his leave. And then also, during that time, he's not unemployed. He can pursue job options and fill out the application that says employed. Looking for a new job while still being fully employed. That really didn't work out. It may not have panned out for him, but isn't that a big benefit? I would think, looking for a job when you have none is a lot more difficult than looking for a job while you've got one. That is true. I would say it didn't cost the agency anything. I would say it was a very slight thing to do. You have this accrued time. Okay, we'll just put your date at the end of it as opposed to putting it today. It didn't cost them anything. It wasn't that tremendous of a benefit. It's not like giving them a half a million dollars. Here's your severance. Here's your golden parachute. He certainly didn't get that. He got de minimis. Okay, you can resign. If they had actually given him notice of proposed removal, would he have been entitled to every penny of one he got by having the date pushed out? Would he have been entitled to it? I'm not sure. His annual, accrued annual leave was, went into August of the leave. Would he, he would have, had he been terminated shortly after, go through the notice of the proposed termination and then termination if that happened, would he have still been able to get the cash for the amount of his accrued leave? It's my, I can't say I'm an expert as to the accrued leave. It's my understanding that he would. I could be, I could be misinformed on that. It seems to me if he's, if he's earned it, he should be permitted. Now, the period between the expiration of his annual leave in August, I think, and the date that he obtained, ultimately September, sometime on September 20th, I think, something like that, was, was that a non-pay status for that period, or was he on pay status for that period? That's my recollection. I'm, I'm not possible to direct the shows on that. It may be unclear. Okay. Mr. Chairman, I just want to ask you one question. Related to the policy, as you have warned me, was there any understanding between Mr. Parrott and the agency as to what kind of response the agency would give to inquiries that came in from prospective employers during the period while he was still employed, namely until the end of September? In other words, we know that, and it's in the record, there was a statement as to what would be said during the period after he left the agency and the prospective employer contacted the agency. Was there any understanding as to what would be said during this interim period that you were discussing with Judge Moore? I don't believe there's anything in the record about that. And I don't know that that was specifically discussed otherwise. So I, I don't know that that would be. I didn't see anything. It just came up in your discussion with her. Talking also, again, about the, the time issue. The, the one critical case that's more recent on the time issue is the Middleton, I think, agency reference. It's interesting. In Middleton, procedurally, it was a little different in that the case had just simply been dismissed. And then it was referred back. There was no hearing. We sent it back for a hearing. Correct. There was a non-criminalization. Correct. It is interesting to note, though, in Middleton, the facts are a little bit different. Middleton had, I believe it was 10 or 11 days to make a decision. Now, Mr. Middleton was living abroad, and he had some other difficulties. But their 10, 11 days was potentially too short a time. But wasn't the agency in that case misleading? I mean, weren't there fact findings that suggested that the agency actually misled the employee in that context? Well, to, to a certain extent. That doesn't exist here, right? I mean, you're not suggesting, and you're not going to understand the agency who ever found that Mr. Parrott was misled by the agency. The way those cases break down into misleading and as a specific subset, I would say it was misleading the way they presented his termination. In Middleton or to Mr. Parrott? To Mr. Parrott. What was misleading about him? Didn't they advise him of all of his rights? The testimony on this from the three witnesses is one of the more troubling things in this case. All three of them told him, said different things as to what was told to Mr. Parrott. Campaign said it was discussed in general terms. Conan says he was told about the nature of the charges and given examples. But didn't one of the three of them get up and leave for a little while so that it was at one point, not all three of them were there during the entire time period. Isn't that correct? That is correct. But they should have, they should have lined up pretty closely. And Conan was saying that they were, that they were given specific examples. There's really no specific examples. There are two issues. And it was just a little. But they credited that testimony as credible. Credibility determinations on appeal for us are virtually unreviewable. How in the world could we, in the absence of any evidence to the contrary, conclude that the AJ's determination of credibility was wrong? The cases that talk about credibility being unreviewable, as I have read, is there's nothing in the record to contradict. No, I don't think that's a fair representation. I think it's typically those cases, Tom, where there is something in the record on both sides. And the administrative judge or case fact finder decides that one party is going to do the other. Maybe I should put my point on a little finer than I said. There has to be something in the record for them to make a finding, for the ALJ to make a finding of fact. It has to be supported by anything but the record. And here, unfortunately, we have a statement about the credibility of the witnesses that's based on who they are. Mr. Parent says, I was told basically if I didn't quit, if I got fired, I would be ineligible. And Administrator Blanchard said, I can't believe Tom Paley said it. A person in his position. And I would respectfully submit that that taints his findings of facts as to the credibility. He's used stereotyping, which is impermissible. He can't simply say, oh, well, Tom Paley's hired. I credit him more than Parent. He had to say, hold on, this was inconsistent. This was more consistent. And really, he made findings of fact against Mr. Parent that aren't really in the record. He says, well, he changed his statement. It's in the brief. I can't point to it right here. He said, well, he changed his statement. And it's clear if you look at the hearing testimony, he didn't change his story. He was talking about the fact that he was the AJ, did hear all the testimony, had the documentary evidence in front of him. And one of the points you made when you were starting this aspect of your argument was that the testimony didn't line up. Well, in a sense, one could say that that suggests that ways of taking the credibility is one could say, well, the witnesses didn't all get in the room and say, OK, here's what we're going to say. You know, you've got a more honest response. I mean, I guess was it Ms. Cone who was the agency attorney that you were in with the whole time? Yes. The other point on the credibility of witnesses, and this is where I'd say, they should have had a reason for why they couldn't give him more time. And it was all over the law. Now, Paine says, I didn't believe I had authority to give him more time. How a person in his position could say he didn't have authority to give him more time? Well, I mean, the thing is, I think there's a good argument. I mean, I think the questioning has suggested that all three members of this panel, including counsel for the board and counsel for the agency, would, if they had been in the room, have given Mr. Garrett more time, we wouldn't be here. But the fact remains, did that, under the circumstances of the case, render his decision involuntary? I would say yes. And it might be a different case if he didn't ask for more time. If he said, I got it. Yeah, this is what I want to do. And this just had a change of heart. He clearly, he was trained, you know, the government's made much about, well, he's a former CIA operative. But that didn't help him out here. He wasn't in HR for all those years. I mean, they said, well, he knew small hands, small arms, striking a scuba. That didn't help him out here. He was composed. That didn't help him out here. He had no prior real-life experience with what the charges are, what is the system, what's their burden, all of these things. I mean, we see how we are weighing these things. How is Mr. Parrot, who has no idea about this, supposed to weigh it in and out? I mean, that's what he was really faced with. That's why we respectfully submit that it was coercive to him to give him this time, to deny him a term when he asked for one, and we respectfully submit that the decision for Weller should be reversed and dispatched to the United States. All right. Mr. Schiller, thank you. Mr. Thorgan, Mr. Lester, thank you, and thank you to counsel for a well-argued case. That concludes this morning's proceedings. All rise. The honorable court is adjourned until this afternoon at 2 o'clock p.m.